IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| STATE OF TEXAS, by and through its Attorney General, Ken Paxton; and W&T OFFSHORE, INC., *Plaintiffs*, v. JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *Defendant*. | Civil Action No. 9:25-cv-10 |

# COMPLAINT

The State of Texas, by and through its Attorney General Ken Paxton, and W&T Offshore, Inc. bring this civil action against the above-listed Defendant to enjoin Defendant and allege as follows:

## INTRODUCTION

1. Throughout his Administration, the President has launched an aggressive, all-out assault on the Nation's development of oil and natural gas resources. *See, e.g.,* Exec. Order No. 14008 (Jan. 27, 2021) (pausing "new oil and natural gas leases on public lands and offshore waters"); *FACT Sheet: Biden-Harris Administration Announces Temporary Pause on Pending Approvals of Liquefied Natural Gas Exports*, White House (Jan. 26, 2024) https://tinyurl.com/mtfetjne. Courts throughout the Gulf region have consistently held President Biden's actions as unlawful. *See, e.g., Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022) (permanently enjoining implementation of federal pause of new oil and gas leases); *Louisiana v.*

1

*Biden*, No. 2:24-CV-00406, 2024 WL 323103 (W.D. La. July 1, 2024) (preliminarily enjoining LNG export ban).

2. On January 6, 2025—two weeks before leaving office—President Biden permanently withdrew areas of the United States Outer Continental Shelf ("OCS") located in the Atlantic Ocean, Gulf of Mexico, and Pacific Ocean. *See* Memorandum on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Oil or Natural Gas Leasing (Gulf of Mexico, Atlantic, and Pacific areas) (Jan. 6, 2025), https://tinyurl.com/bdd49s4h (attached hereto as **Exhibit 1**). Relevant to this action, President Biden withdrew large portions of the eastern Gulf of Mexico from consideration for oil and gas development indefinitely.

3. President Biden's last-minute attempt to dictate federal policy on oil and natural gas in perpetuity runs afoul of the Constitution. It is Congress—not the Executive—that has the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3 cl. 2. By permanently withdrawing the eastern Gulf of Mexico from consideration for oil and gas development, President Biden has overstepped his authority, infringing upon the powers granted to Congress by the Framers, and violating separation of powers protections enshrined in the Constitution.

4. Although Congress has delegated authority to the President to "from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf," 43 U.S.C. § 1341(a), nothing in this grant of authority suggests that such withdrawal may be permanent. In fact, including the phrase "from time to time" indicates the contrary—that the President may only make temporary withdrawals that may be reconsidered in the future.

5. The Court should therefore grant the relief requested by Plaintiffs, who are permanently harmed by the Withdrawal Memorandum.

## PARTIES

6. Plaintiff State of Texas is a sovereign State of the United States of America. Ken Paxton is the Attorney General of the State of Texas. He is authorized by the Texas Constitution and Texas statutes to sue on the State's behalf. *See* TEX. CONST. art. IV, § 22; TEX. GOV'T CODE Ch. 402; *see also* H.B. 1, art. IX, § 16.01, 82nd Tex. Leg., R.S. (2011). His offices are located at 300 W. 15th Street, Austin, Texas 78701.

7. W&T Offshore, Inc. is a Texas-based, oil and natural gas producer. W&T engages in the acquisition, exploration, development, and production of oil and natural gas properties, focused primarily in the Gulf of Mexico. W&T has spent millions of dollars to develop and use proprietary data to show that gas is likely present in the area of the Gulf of Mexico covered by Defendant's Withdrawal Memo. At the time of the Withdrawal Memo, W&T intended to bid on drilling rights in that area, as they became available. Based on its bidding history, W&T had a reasonable likelihood of obtaining drilling rights in that area. Because the Withdrawal Memo imposed a permanent moratorium on new oil and gas leases in this area, W&T has suffered and will continue to suffer numerous financial harms.

8. Defendant Joseph R. Biden Jr. is the President of the United States. He is sued in his official capacity.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction over this case because it arises under the laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361. An actual controversy exists between

the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief under 28 U.S.C. §§ 2201–02 and its inherent equitable powers.

10. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because: (1) Defendant is a United States officer sued in their official capacity; (2) the State of Texas is a resident of this judicial district; (3) no real property is involved; and (4) a substantial part of the events or omissions giving rise to the Complaint occurs within this judicial district. *See Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1982); *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020).

## BACKGROUND

### A. Outer Continental Shelf Lands Act

11. Acting pursuant to its powers vested by the Constitution to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2, Congress enacted the Outer Continental Shelf Lands Act ("OCSLA") on August 7, 1953. In doing so, Congress declared that:

> the outer Continental Shelf is a vital national resources reserve held by the Federal Government for the public, *which should be made available for expeditious and orderly development*, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs[.]

43 U.S.C. § 1332(3) (emphasis added).

12. To meet this goal, via OSCLA, Congress established a comprehensive oil and gas leasing program for the OCS to be administered by the Secretary of the Interior. *See* 43 U.S.C. § 1334(a). The Secretary is authorized "to grant to the highest responsible qualified bidder or bidders by competitive bidding, under regulations promulgated in advance, any oil and gas lease on submerged lands of the outer Continental Shelf" not covered by prior leases. *Id.* § 1334(a)(1).

Further, "OSCLA establishes four distinct stages in the administrative process: (1) formulation of a five-year leasing plan by the Secretary; (2) lease sales; (3) exploration by the lessees; and (4) development and production." *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627, 632–33 (E.D. La. 201) (citing *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984)).

13.  OCSLA recognizes and documents the extensive and fundamental interests held by the States that could be affected by OSCLA-related activities. Here are a few examples:

- "[T]he rights and responsibilities of all States and, where appropriate, local governments, to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized[.]" 43 U.S.C. § 1332(5).

- "To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereto, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . ." *Id.* § 1333(a)(2)(A).

- "In the enforcement of safety, environmental, and conservation laws and regulations, the Secretary shall cooperate with the relevant departments and agencies . . . of the affected States." *Id.* § 1334(a).

- "The Secretary shall provide for coordination and consultation with the Governor of any State or the executive of any local government that may be affected by a lease, easement, or right-of-way under this subsection." *Id.* § 1337(p)(7).

- "The Secretary shall not grant any license or permit for any activity described in detail in an exploration plan and affecting any land use or water use in the coastal zone of a State with a coastal zone management program approved pursuant to section 1455 of Title 16, unless the State concurs or is conclusively presumed to concur with the consistency certification accompanying such plan pursuant to section 1456(c)(3)(B)(i) or (ii) of Title 16, or the Secretary of

5

>
> Commerce makes the funding authorized by section 1456(c)(3)(B)(iii) of Title 16." *Id*. § 1340(c)(2).

- "After such preparation and at least sixty days prior to publication of a proposed leasing program in the Federal Register pursuant to paragraph (3) of this subsection, the Secretary shall submit a copy of such proposed program to the Governor of each affected States for review and comment." *Id*. § 1344(c)(2).

- "Any Governor of any affected State ... may submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan." *Id*. § 1345(a).

- "The Secretary shall accept recommendations of the Governor ... if he determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id*. § 1345(c).

14. In addition to OSCLA's leasing scheme, Congress delegated to the President certain powers to manage OCS lands. Specifically, under Section 12(a) of OSCLA, the President "may, from time to time, withdraw from disposition any of the unleased lands of the outer Continental Shelf." 43 U.S.C. § 1341(a).

### B. Prior, Temporary Withdrawals of the Eastern Gulf of Mexico

15. GOMESA, enacted on December 20, 2006, established a moratorium on new oil and gas leases in certain areas of the Gulf of Mexico ("GOMESA Moratorium"). The GOMESA Moratorium prohibited the Secretary from offering for lease, prelease, or any other related activity in three areas defined by Congress until June 30, 2022. GOMESA, Pub. L. 109-432, 120 Stat. 3001, § 104(a). The first was any area east of the Military Mission Line[1] in the Gulf of Mexico. *Id*. § 104(a)(1). The second was any area within the Eastern Planning Area[2] within 125 miles of the

---

[1] The "Military Mission Line" is the "north-south line at 86°41' W. longitude. GOMESA, Pub. L. 109-432, 120 Stat. 3001, § 102(8).

[2] The "Eastern Planning Area" is "the Eastern Gulf of Mexico Planning Area of the outer Continental Shelf, as designated in the document entitled 'Draft Proposed Program Outer Continental Shelf Oil and Gas Leasing Program 2007–2012.', dated February 2006." *Id*. § 102(5).

coastline of Florida. *Id*. § 104(a)(2). And the third was any area within the Central Planning Area[3] that is either: (1) within the 181 Area[4] 100 miles of the coastline of Florida; or (2) outside the 181 Area, east of the western edge of the Pensacola Official Protection Diagram,[5] and within 100 miles of the coastline of Florida. *Id*. § 104(a)(3). A map of the areas covered by the GOMESA Moratorium below (**Figure 1**).



---

[3] The "Central Planning Area" is "the Central Gulf of Mexico Planning Area of the outer Continental Shelf, as designated in the document entitled 'Draft Proposed Program Outer Continental Shelf Oil and Gas Leasing Program 2007–2012.', dated February 2006." *Id*. § 102(4).

[4] The "181 Area" is "the area identified in map 15, page 58 of the Proposed Final Outer Continental Shelf Oil and Gas Leasing Program for 199–2002, dated August 1996, of the Minerals Management Service, available in the Office of the Director of the Minerals Management Service excluding the area offered in OCS Lease Sale 181, held on December 5, 2001." *Id*. § 102(1).

[5] The "Pensacola Official Protection Diagram" (OPD) is as the OPD that has a western edge located at the UTM X coordinate 1,393,920 in the NAD27. 89 Fed. Reg. 31592 (Apr. 24, 2024).

**Figure 1: GOMESA Moratorium Areas**[6]

16. On September 8, 2020, President Donald J. Trump issued a memorandum that further extended the GOMESA Moratorium in the eastern Gulf of Mexico. Memorandum on Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition, 2020 Daily Comp. Pres. Doc. 659 (Sept. 8, 2020). President Trump's withdrawal, unlike the Withdrawal Memorandum, was *limited* to 10 years, extending the GOMESA Moratorium until June 30, 2032. *Id*.

C. **President Biden's Unlawful Permanent Withdrawal**

17. On January 6, 2025, citing his authority found in Section 12(a) of OSCLA, President Biden withdrew "from disposition by oil or natural gas leasing for a time period *without specific expiration*" certain regions of OCS in the Atlantic and Pacific Oceans. Ex. 1 at 1–2 (emphasis added). Additionally, and specific to this action, President Biden withdrew "the areas of the Outer Continental Shelf designated by section 104(a) of [GOMESA.]" *Id*. As a result, over 625 million acres of OCS lands have been ***permanently*** removed from consideration for future development. *FACT SHEET: President Biden Protects Atlantic and Pacific Coasts from Offshore Oil and Gas Drilling*, White House (Jan. 6, 2025) https://tinyurl.com/ybcv7s3m (attached hereto as **Exhibit 2**).

18. In doing so, President Biden cites alleged "principles of responsible public stewardship" as well as "irreplaceable marine and coastal environments," "expeditious and orderly development of the vital renewable energy resources of the Gulf of Mexico, Atlantic and Pacific areas of the Outer Continental Shelf," and "the national need to curtail, mitigate, build resilience

---

[6] Pulled from *2019–2024* National *Outer Continental Shelf Oil and Gas Leasing Draft Proposed Program; Bureau of Ocean Energy Management* 12 (Jan. 2018) https://tinyurl.com/2p9du7wn.

against, and adapt to the devastating and irreversible consequences of climate change for the human environment and for the marine and coastal environments." Ex. 1 at 1. With no demonstrable proof or evidence, or without any form of public input, President Biden "determined that the environmental and economic risks and harms that would result in drilling in these areas outweigh their limited fossil fuel resource potential." Ex. 2 at 1. Instead of offering empirical support for his decision, President Biden instead took an action to "build upon the Biden-Harris Administration's ambitious climate agenda" and putative commitment to America's natural wonders. *Id*. at 3.

### D. The Permanent Withdrawal Harms Plaintiffs

19. Texas is harmed by the permanent withdrawal of OCS lands in the Gulf of Mexico. Texas has significant oil and gas refining and production infrastructure, which is the source of jobs and taxes paid to state and local governments. *See 2024 Annual Energy & Economic Impact Report*, Tex. Oil & Gas Ass'n (Jan. 7, 2025) https://tinyurl.com/us3caha6 (oil and natural gas industry paid $27.3 billion in taxes and royalties in 2024).

20. Furthermore, Texas has significant interests in the federal oil and gas leasing programs within the Gulf of Mexico and receives substantial revenues from oil and gas leasing. GOMESA "created a revenue-sharing model for oil- and gas-producing gulf states" under which Texas "receive[s] a portion of the revenue generated from oil and gas production offshore in the Gulf of Mexico" that are used for costal conservation, restoration, and hurricane protection projects. *Gulf of Mexico Energy Security Act (GOMESA)*, U.S. Dep't of the Interior Natural Resources Revenue Data (accessed Jan. 15, 2025) https://tinyurl.com/mvktux52. Since 2009, Texas has received over $535 million in GOMESA payments, receiving over $95.5 million in 2024 alone. *Texas Revenue Data*, U.S. Dep't of the Interior Natural Resources Revenue Data (accessed Jan. 15, 2025) https://tinyurl.com/txv626sm.

9

21. By permanently withdrawing the eastern Gulf of Mexico from consideration for oil and gas development, the Withdrawal Memorandum deprives Texas of millions—if not billions— of dollars of future revenues that would go towards important economic and environmental projects along its coasts. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 501 (5th Cir. 2024) ("change in revenue is a quintessential economic injury" that provides Article III standing); *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 380 (5th Cir. 2021) ("possibility of reduced sales ... provides standing to pursue [a] claim"). The Supreme Court "routinely recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement] . . . It follows logically that any . . . petitioner who is likely to suffer economic injury as a result of [governmental action] that changes market conditions satisfies this part of the standing test." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (alterations in original) (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994))). W&T Offshore, Inc. has suffered and will continue to suffer numerous financial harms because of the permanent moratorium on drilling imposed by the Defendant. First, W&T will lose profits from developing a successful lease. W&T has been successful in more than 50% of its bids on drilling rights. Once the rights are secured, W&T has an approximately 90% success rate in drilling. The company has invested extensive resources in proprietary mapping technology and personnel to determine which areas are likely to be drilled successfully. For instance, utilizing its proprietary data, W&T developed a business prospect within the moratorium area. W&T has lost the opportunity to lease this prospect due to the permanent ban. Second, Defendant's shrinkage of available areas for drilling will increase costs to W&T in numerous ways. As the remaining areas available for drilling decrease, the same

exploration companies bidding over a shrinking supply will cause the cost of individual leases to rise. Defendant's removal of drilling areas near the United States coast will cause W&T additional expenses in transportation and supply as it is forced to operate farther from its base of operations. Further, the likely result of Defendant's removal of areas available for drilling is that W&T will operate fewer drilling sites. This will make each site proportionately more expensive as W&T amortizes its costs over fewer sites. Additionally, fewer employees will be used, and employment will be lost as fewer drilling sites are operated. In simple terms, W&T will be left with no choice but to terminate some of its workforce. Importantly, W&T has expended significant resources on private contracts with third parties for the acquisition—and separate "reprocessing"—of seismic data. The data obtained from these contracts, in part, relates to areas now under permanent moratorium, in essence rendering that data and those contracts useless. To be clear, W&T would not have expended the resources it did on data collection had it known President Trump's 10-year moratorium would be converted into a permanent ban. As such, W&T has and will continue to suffer substantial damages as a result of President Biden's permanent moratorium.

## CLAIM FOR RELIEF

### Violation of the OSCLA – Exceeding Statutory Authority
### *Ultra Vires*

**A. The Withdrawal Memorandum Exceeds the Authority Granted to the President by the Plain Text of OSCLA**

22. Plaintiffs reallege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth fully herein.

23. The Withdrawal Memorandum exceeds the President's authority under OSCLA, which only allows the President to withdraw OCS lands from consideration "from time to time." 43 U.S.C. § 1341(a).

24. "The principal purpose of [OCSLA] is to authorize the lease by the Federal Government of . . . the shelf." H.R. Rep. No. 83-413 at 2 (1953), *reprinted in* 1953 U.S.C.C.A.N. 2177, 2178. This purpose is found within the statute itself: "the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, *which should be made available for expeditious and orderly development . . . .*" 43 U.S.C. § 1332(3).

25. A permanent withdrawal would undercut these purposes and policy goals by removing from consideration the OCS lands within the eastern Gulf of Mexico in perpetuity. Future Presidents would no longer have the ability to lease the lands to develop the "vital" natural resources found in that region. *See League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1021 (D. Alaska 2019) *vacated as moot by League of Conservation Voters v. Biden*, 843 Fed. Appx. 937 (9th Cir. 2021) (mem.) ("The text of Section 12(a) refers only to the withdrawal of lands; it does not expressly authorize the President to revoke a prior withdrawal."). An interpretation of Section 12(a) to allow permanent withdrawals would deprive future Presidents to withdrawal lands "from time to time" and could lead to eliminating the need for a comprehensive OCS leasing program entirely by whittling away lands available for development.

26. Moreover, the OCSLA specifically provides that, not only should the OCS be made available for development, but that it must be done so "in a manner consistent with the maintenance of competition . . ." 43 U.S.C. § 1332(3). The Withdrawal Order exceeds this parameter in two ways. First, permanent withdrawal of hundreds of millions of acres from development not only destroys any and all competition within the withdrawn portions, it also degrades—rather than maintains—competition in the remainder of the Gulf of Mexico; this degradation in competition harms both Texas and private industry participants like W&T by raising

costs of operations, some of which are unrecoverable and the rest of which flow down the chain of commerce to consumers like Texas and its residents.

27. President Biden has violated the language of Section 12(a) by permanently withdrawing the eastern region of the Gulf of Mexico from consideration for oil and gas development. Accordingly, the Court should declare the Withdrawal Memorandum unlawful.

### B. The Major Questions Doctrine Further Demonstrates why the Withdrawal Memorandum Violates OSCLA

28. Plaintiffs reallege and incorporate by reference the facts and allegations set forth in all preceding paragraphs as if set forth fully herein.

29. By issuing the Withdrawal Memorandum and thus withdrawing significantly more acreage of OCS lands than any other administration,[7] President Biden exceeds the authority granted to him in Section 12(a) of OSCLA as demonstrated by the major questions doctrine.

30. "In certain extraordinary cases, both separation of powers principles and practical understanding of legislative intent make the court reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." *Mayfield v. U.S. Dep't of Lab.*, 111 F.4th 611, 616 (5th Cir. 2024) (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)) (cleaned up). Under the major questions doctrine, an agency's (or President's) asserted authority triggers heightened scrutiny when it concerns either "a matter of great political significance" or seeks to "regulate a significant portion of the American economy." *Mayfield*, 111 F.4th at 616; *West Virginia*, 597 U.S. at 743–44. The purpose is straightforward yet fundamental: Congress, not the Executive, decides vital policy

---

[7] David Hodari, *Biden Bans new offshore drilling along most of the U.S. coastline*, NBC News (Jan. 6, 2025) https://www.nbcnews.com/news/us-news/biden-bans-new-offshore-drilling-us-coastline-atlantic-pacific-trump-rcna186338 ("While President Barak Obama used the act in 2016 to protect 119 million acres of land, Monday's move is much larger and will be viewed as a significant victor for environmental groups that have long argued further drilling contradicts the U.S. government's goal of slashing emissions that lead to climate change.").

questions. If the President insists on staking out new territory that upsets careful statutory arrangements, he must be able to point to "clear congressional authorization" for that extraordinary claim of power. *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In short, the doctrine "serves as a bound on Presidential authority." *Louisiana v. Biden*, 55 F.4th 1017, 1029 (5th Cir. 2022).

31. The Withdrawal Memorandum pulls both triggers for the major questions doctrine. First, by permanently withdrawing significant portions of OCS lands in the eastern Gulf of Mexico, President Biden purports to resolve a matter which he deems to be of great political significance—the decision to allow development of oil and natural gas resources in the OCS *forever*. Second, by permanently withdrawing OCS lands from consideration, President Biden directly regulates a significant portion of the American economy in perpetuity—foreclosing the possibility for oil and gas development in the eastern Gulf of Mexico long beyond his time in office. In other words, President Biden's action here is precisely the kind of "extraordinary program" that calls for a demanding application of the major questions doctrine. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023). Few decisions more directly involve questions of national energy security, economic prosperity, and resource allocation than permanently withdrawing these OCS lands. Removing them from future disposition quite literally takes vital energy resources off the market—an action that carries significant economic ramifications for the States, the federal government, and the private industry alike.

32. President Biden lacks the requisite clear congressional authorization to issue the Withdrawal Memorandum. Section 12(a) provides, in full, that "[t]he President of the United States may, from time to time, withdraw from disposition any of the unleased lands of the outer

Continental Shelf." 43 U.S.C. § 1341(a). Nowhere does the statute authorize a permanent withdrawal of OCS lands from consideration of development of oil and gas resources. To the contrary, such an interpretation would run counter to Congress's stated goal of expeditious development, *id.* at § 1332(3) and would amount to hiding an elephant in a mousehole. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Despite the magnitude of this decision, the Withdrawal Memorandum cites no "clear congressional authorization." *West Virginia*, 597 U.S. at 723. Rather, "from time to time" is a phrase that evinces only limited, temporary discretion—not blanket, perpetual authority that would effectively rewrite OSCLA's goal of "expeditious and orderly development." 43 U.S.C. § 1332(3). Courts have consistently rebuffed efforts to uncover "unheralded power" in mere textual ambiguity—particularly when the claimed authority is a "novel" and "unprecedented" interpretation of a statute—as the Withdrawal Memorandum is. *West Virginia*, 597 U.S. 697, 716, 724, 729.

33. President Biden issued the Withdrawal Memorandum without the clear congressional authorization required by the Constitution, the Supreme Court, and this Circuit's precedent. The Withdrawal Memorandum thus collides with the major questions doctrine on all fronts. Historical practice offers no support for such a vast and indefinite withdrawal: no prior Administration has claimed the power to foreclose on the nation's largest energy reserves in perpetuity. Indeed, the Supreme Court has repeatedly invalidated similarly sweeping assertions of extratextual authority, including cancelling private student loan obligations and halting nationwide eviction proceedings. *Nebraska*, 143 S.Ct 2355 (2023); *Ala. Ass'n of Realtors v. HHS*, 141 S.Ct 2485 (2021). Just as with those cases, President Biden's indefinite withdrawal is a dramatic overreach that cannot stand.

34. Thus, the Court should declare the Withdrawal Memorandum unlawful and set it aside.

## PRAYER FOR RELIEF

35. Plaintiffs therefore request that the Court enter an order and judgment that grants the following relief, which it is authorized under 28 U.S.C. §§ 2201–2202:

   a. Declare that the Withdrawal Memo is *ultra vires*.

   b. Enjoin Defendant from enforcing the Withdrawal Memo.

   c. Grant all other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

Dated: January 20, 2025.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

**RYAN D. WALTERS**
Chief, Special Litigation Division

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

Respectfully submitted,

*/s/ Ryan Kercher*
**RYAN G. KERCHER**
Deputy Chief, Special Litigation Division
Texas State Bar No. 24060998

**WESLEY S. WILLIAMS**
(Application Pending)
Assistant Attorney General
Texas State Bar No. 24108009

**ZACHARY BERG**
Special Counsel
Texas State Bar No. 24107706

**GARRETT GREENE**
Special Counsel
Texas State Bar No. 24096217

Ryan.Kercher@oag.texas.gov
Wesley.Williams@oag.texas.gov
Zachary.Berg@oag.texas.gov
Garrett.Greene@oag.texas.gov

**COUNSEL FOR THE STATE OF TEXAS**

*[signature: George J. Hittner]*

**GEORGE J. HITTNER**
Executive Vice President and General Counsel
Texas State Bar No. 24038959

**RALPH E. IMPERATO**
Vice President and Deputy General Counsel
Tex. State Bar No. 24038112

W&T OFFSHORE, INC.
5718 Westheimer Rd, Ste. 700
Houston, Texas 77057
(713) 626-8525
ghittner@wtoffshore.com
timperato@wtoffshore.com

and

**YASSER A. MADRIZ**
Texas State Bar No. 24037015
McGuireWoods LLP
845 Texas Ave., Suite 2400
Houston, Texas 77002
(832) 255-6361
ymadriz@mcguirewoods.com

**COUNSEL FOR W&T OFFSHORE, INC.**